

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00427-CR
### NO. 02-11-00428-CR
### NO. 02-11-00429-CR

JUNE G. LOPEZ A/K/A JUNE G. MISHLER                                    APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant June G. Lopez a/k/a June G. Mishler appeals her three convictions for aggravated assault with a deadly weapon. In two points, Lopez

---

[1]*See* Tex. R. App. P. 47.4.

contends that the evidence is insufficient to support her convictions and that the trial court abused its discretion by excluding relevant testimony. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Lopez and her husband, Larry Mishler, owned the Caribbean Cowboy Bar & Grill. Chris Currier was a regular at the Caribbean Cowboy and had become a close friend of Lopez and Mishler. On the evening in question, Lopez, Mishler, and Currier went out together. After dinner and drinks, they continued their night at the Caribbean Cowboy.

Based on the events at the Caribbean Cowboy that night, which we discuss in detail below, Lopez was charged with aggravated assault with a deadly weapon against Damon Bullock, aggravated assault with a deadly weapon against Saturnino Salzida Jr., and aggravated assault with a deadly weapon against Currier.[2] A jury convicted her in all three cases and assessed punishment at two years' confinement, ten years' confinement probated for ten years, and ten years' confinement, respectively. The trial court sentenced her accordingly and ordered the sentences to run concurrently.

---

[2]The aggravated assault charges involving Bullock and Salzida were both based on threatening them with imminent bodily injury while using a gun, and the aggravated assault charge involving Currier was based on causing him bodily injury by shooting him with a gun. *See* Tex. Penal Code Ann. §§ 22.01(a), 22.02(a) (West 2011).

### III. SUFFICIENCY OF THE EVIDENCE

In her first point, Lopez argues that the evidence is insufficient to sustain her convictions because the evidence conclusively shows that she was acting in self-defense and in defense of a third person, Mishler.

### A. Standard of Review and
### Law on Self-Defense and Defense-of-Third-Persons Justifications

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are

3

reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

A person commits assault if she (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens another with imminent bodily injury. Tex. Penal Code Ann. § 22.01(a). A person commits aggravated assault if she commits assault and uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(a)(2).

It is a defense to aggravated assault that the conduct in question is justified. *Id.* § 9.02 (West 2011). Whenever the use of force is justified, the threat of force is similarly justified. *Id.* § 9.04 (West 2011). A person is justified in using force against another when and to the degree the person reasonably believes the force is immediately necessary to protect herself against another's use or attempted use of unlawful force. *Id.* § 9.31(a) (West 2011). "Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id.* § 1.07(a)(42) (West 2011). Self-defense is inapplicable if the actor said or did something to provoke the other's use or attempted use of unlawful force as a pretext for inflicting harm upon the other; this is known as the doctrine of provocation or "provoking the difficulty." *Id.* § 9.31(b)(4); *Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998).

4

A person is justified in using force against another to protect a third person if (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified in using self-defense to protect herself against unlawful force she reasonably believes to be threatening the third person she seeks to protect and (2) she reasonably believes that this intervention is immediately necessary to protect the third person. Tex. Penal Code Ann. § 9.33 (West 2011). As with self-defense, the provocation doctrine can apply as a bar to the defense-of-third-person justification. *See Berry v. State*, 80 Tex. Crim. 87, 90, 188 S.W. 997, 999 (1916). If the interfering party knows that the third person has provoked the difficulty, the interfering party's subsequent use of force is not justified. *See id.*

After the defendant has introduced some evidence supporting a defense, the State bears the burden of persuasion to disprove it. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (explaining that a conviction produces an implicit finding against the defensive theory). This burden does not require the State to introduce evidence disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Id.* To determine sufficiency of the evidence to disprove a nonaffirmative defense, the appellate court asks "whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the [defensive] issue beyond a reasonable doubt." *Saxton v. State*,

804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Smith v. State*, 355 S.W.3d 138, 144–47 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (applying *Saxton* and *Zuliani* to the jury's rejection of the defendant's self-defense and defense-of-third-person theories).

Because Lopez is appealing three convictions for aggravated assault, each with its own facts, we will discuss separately the sufficiency of the evidence supporting each conviction. In each case, we must decide whether there is sufficient evidence, viewed in the light most favorable to the prosecution, to allow a rational jury to find the elements of aggravated assault with a deadly weapon beyond a reasonable doubt and find against Lopez's defensive theories beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

**B. Sufficiency of the Evidence: Aggravated Assault of Bullock**

At trial, seven eyewitnesses testified about the events that took place at the Caribbean Cowboy. The testimony from the State's witnesses varied from one another to an extent, but the testimony between the State's witnesses and Lopez's witnesses varied sharply.

*1. The State Portrayed Lopez as the Aggressor*

Salzida was a former employee of the Caribbean Cowboy and a friend of Lopez. Salzida hung out and played darts with Lopez and Mishler on the night in question. James Eads, a frequent patron of the Caribbean Cowboy, also joined the group to play darts. Bullock was bartending at the Caribbean Cowboy that night. Darrell, an off-duty bartender at the Caribbean Cowboy, showed up at the

6

bar intoxicated. Darrell asked for help getting home. Against the Caribbean Cowboy's policy, Bullock let Darrell go behind the bar so they could figure out how to get him home. Lopez and Mishler approached Bullock to question him as to why Darrell was behind the bar.

Bullock testified that Lopez and Mishler then began accusing him of giving away free drinks. Bullock was counting credit card receipts and arguing with Lopez and Mishler, who were also arguing with each other. At some point during the argument, Bullock commented that he was not surprised that Lopez and Mishler were arguing again. In response to his comment, Mishler yelled at Bullock, "Don't ever say anything about me and my wife like that," and then slapped the credit card receipts out of his hand. Bullock pushed Mishler into the bar's sink. Lopez yelled at Bullock, "Oh, you're going to push my husband like that[?]" She ran toward Bullock but tripped and fell before reaching him. She got up, straightened her weave, and told Bullock that she was going to get a gun.

Bullock and Mishler began wrestling on the floor behind the bar. Mishler had ahold of Bullock's legs, preventing him from getting up. During this time, Lopez walked to her office and returned with a gun. Salzida and Eads tried to get Mishler to let Bullock get up and kept telling Mishler, "Let him go, Let him go. He wants to leave." Lopez then fired a warning shot. Eads testified that Mishler and Bullock had separated before Lopez fired the gun:

> When I rounded the corner, I grabbed [Bullock]'s arm to start trying to get him to stop with their fight. And [Salzida] said, "[Lopez]'s going for a gun"—you know, "[S]he's going for a gun."

7

And I said, "[Bullock], stop, stop." And he looked at me and said, "Okay, I quit, I'm done."

And, at that point, we—then we're working on [Mishler] saying, "[Mishler], let go, let go, let's get up." And [Salzida] and I grabbed [Mishler], pulled him to the side. And so, at that point, it's all broken up, it's stopped. And within a second, the gun went off behind us.

Eads further clarified that when Lopez fired the warning shot, the situation was already under control.

After the warning shot, Lopez pointed the gun at Bullock, who was now by himself on the ground, and yelled, "I'll kill you . . . . You don't attack me in my bar." Salzida told Lopez that the gun was unnecessary, and she turned and pointed the gun at him, ordering him to stay out of it. Lopez then turned and pointed the gun back at Bullock. Eads told Bullock it was time to leave. Bullock agreed.

### 2. *Lopez Portrayed Bullock as the Aggressor*

The defense called Lopez and Mishler as witnesses. According to their testimony, Lopez was concerned that Bullock was giving his roommate Jason free drinks at the bar that night. She told Mishler to help her monitor the situation. Over the next two hours, the couple observed Bullock give Jason more free drinks.

Lopez and Mishler began questioning Bullock about the free drinks he gave Jason. When Bullock denied giving away the drinks, Mishler ordered another employee to get the scales so they could take an inventory of the alcohol. Bullock then said he was quitting and asked Mishler if he really thought

8

Bullock was stealing. Mishler responded that giving away drinks is the same as stealing. Bullock lowered his head and rammed Mishler into the bar's sink.

Mishler, who was trying to regain his balance after the push, saw Bullock move toward the open end of the bar toward Lopez. Mishler feared that Bullock was going to harm Lopez so Mishler put his foot out to trip Bullock; they both fell to the ground. Mishler grabbed Bullock's legs to prevent him from getting up. Bullock punched Mishler repeatedly. Lopez went over and pulled on Bullock's shirt to try to help Mishler. Bullock responded by turning and hitting Lopez into the wall.

Lopez testified that she was scared for her own life and for Mishler's life. Lopez ran into her office to grab a gun, re-clipping her weave in her hair as she ran. When she returned from the office, she saw Bullock punching Mishler, so she fired a warning shot to get Bullock to stop. Bullock then separated from Mishler, but Lopez kept the gun pointed at him. Bullock told her to go ahead and shoot him, and Lopez responded that he needed to leave.

### 3. Sufficient Evidence to Support the Jury's Rejection of Lopez's Defensive Theories

Lopez argues that she was justified in using deadly force against Bullock because the evidence conclusively shows that she was acting in self-defense and in defense of Mishler. *See* Tex. Penal Code Ann. §§ 9.31, .33. The trial court instructed the jury on these defenses and on provocation.

9

By finding Lopez guilty of aggravated assault of Bullock, the jury implicitly rejected her self-defense theory and chose to believe the State's witnesses and to disbelieve Lopez's and Mishler's testimony. *See Saxton*, 804 S.W.2d at 914. The jury could have concluded that there was no reasonable basis for Lopez to believe the threat of force was immediately necessary to defend herself based on the State's evidence that Bullock never hit her, that she fell because she tripped as she was coming at Bullock, and that after she sat up and fixed her hair, she walked away from the bar to her office and returned with a gun. *See* Tex. Penal Code Ann. § 9.31(a). The jury also could have concluded that Lopez's threat of deadly force was not proportional to any threat posed by Bullock. *See id.*; *see also Boget v. State*, 74 S.W.3d 23, 30 (Tex. Crim. App. 2002) ("[T]he general rule is that a person should use only such force as is necessary in defending himself.").

Regarding the jury's implicit rejection of Lopez's defense-of-third-person theory, the jury could have believed Eads's testimony that Mishler and Bullock were already separated and that the situation was under control when Lopez fired the warning shot and pointed the gun at Bullock, so that Lopez's threat of force was not immediately necessary to protect Mishler. *See* Tex. Penal Code Ann. §§ 9.31(a), .33. The jury also could have believed Eads's testimony that Lopez yelled, "I'll kill you . . . . You don't attack me in my bar," when pointing her gun at Bullock, thereby demonstrating that her actions were not for the defense of Mishler but were for retribution purposes. *See id.* § 9.33(2).

10

This court must defer to the jury to judge credibility of witnesses, assign weight to their testimony, and draw reasonable inferences from basic facts to ultimate facts in reaching its verdict. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman*, 350 S.W.3d at 595. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational juror could have found beyond a reasonable doubt that Lopez committed aggravated assault of Bullock and that her actions were not justified by her purported self-defense or defense of Mishler. *See Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638; *Saxton*, 804 S.W.2d at 914. We overrule this portion of Lopez's first point.

### C. Sufficiency of the Evidence: Aggravated Assault of Currier

The eyewitness testimony about the events involving Currier also varied; the State presented evidence that Mishler and Lopez were the aggressors, but the defense painted a different picture.

### 1. The State Portrayed Lopez as the Aggressor

After Lopez fired her warning shot, Bullock and Eads made their way toward the Caribbean Cowboy's lobby to leave. Currier then told Bullock not to worry because he had taken a video of the entire incident on his phone.[3] Currier followed Bullock and Eads into the lobby, and Mishler followed all three. Currier testified that Mishler then approached him from behind, demanded his phone, and repeatedly punched him when he did not comply.

---

[3]Currier thought he had recorded a video with his phone but he actually had taken one very out-of-focus picture.

11

Bullock and Eads confirmed Currier's testimony. Bullock testified that Mishler came up behind Currier, said something to him that Bullock could not hear, and then punched Currier two or three times in the back of the head. Eads testified that Mishler pushed Currier, Currier stumbled around, and then Mishler grabbed the back of Currier's shirt and repeatedly punched him in the side of the face.

Eads then grabbed Mishler and told him that Currier did not actually take a video of the incident. While still holding Mishler, Eads turned back to see Lopez walking toward the lobby with the gun pointed in his general direction. Eads pushed Mishler to the side and headed for the exit door. Eads heard a gunshot, turned back, and saw Currier drop to his knees. Currier yelled out that he had been shot. He then crawled out of the lobby.

Several people at the Caribbean Cowboy called 9-1-1. Eads and Salzida stayed with Currier until the paramedics arrived.

### 2. Lopez Portrayed Currier as the Aggressor

According to Mishler, he followed Bullock, Eads, and Currier to the lobby so he could lock the door behind them. Once in the lobby, Currier changed his mind about leaving and turned back toward the bar. When Mishler told him it was time to go, Currier pushed him in an attempt to get back into the bar. Eads

12

grabbed Mishler and held his arms behind his back.  Currier punched Mishler in the face at least twice.[4]

Lopez, who trailed the group with her gun pointed in Bullock's direction, did not know why Currier was punching Mishler, but she said she feared for her husband's life.  She testified that Currier "hit [Mishler] one, two, and [she] was in fear that he was going to kill him, so the gun went off."[5]  Lopez then saw both Mishler and Currier fall to the ground.  She was unsure who, if anyone, she had shot until she saw Currier bleeding.  Lopez ran back into her office to call 9-1-1.

### 3. Sufficient Evidence to Support the Jury's Rejection of Lopez's Defense-of-Mishler Theory

Lopez argues that her aggravated assault against Currier was justified because the evidence conclusively shows that she was acting in defense of Mishler.  *See* Tex. Penal Code Ann. § 9.33.  The trial court instructed the jury on this defense and on the doctrine of provocation, that is, whether Mishler's provocation precluded Lopez's defense-of-third-person justification.[6]

In convicting Lopez of aggravated assault on Currier, the jury must have favored the State's evidence and rejected Lopez's evidence.  *See Saxton*, 804 S.W.2d at 914.  A rational juror could have believed the State's evidence that

---

[4]Currier testified that he never punched Mishler.

[5]Mishler testified that he lost consciousness just before Lopez fired the gun.

[6]The trial court did not instruct the jury on self-defense in this case.

13

Currier never punched Mishler and that Mishler was the sole aggressor so that Lopez could not have reasonably believed that Currier was threatening Mishler or that her intervention was necessary to protect him. *See* Tex. Penal Code Ann. § 9.33. A rational juror also could have believed that Mishler provoked the incident with Currier, while Lopez watched, such that Lopez's actions were not justified. *See id.* § 9.31(b)(4); *Berry*, 80 Tex. Crim. at 90, 188 S.W. at 999.

This court must defer to the jury's credibility determinations. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman*, 350 S.W.3d at 595. Viewing the evidence in the light most favorable to that verdict, we conclude that a rational juror could have found beyond a reasonable doubt that Lopez's aggravated assault against Currier was not justified by her purported defense of Mishler. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. We overrule this portion of Lopez's first point.

### D. Sufficiency of the Evidence: Aggravated Assault of Salzida

Lopez next argues that her aggravated assault against Salzida was justified because the evidence conclusively shows that she pointed her gun at him while acting in self-defense and in defense of Mishler. *See* Tex. Penal Code Ann. §§ 9.31, .33. In this case, however, the trial court did not provide jury instructions on these justifications, Lopez did not object to the omission of the instructions at trial or complain of their omission on appeal. Because we cannot perform a sufficiency of the evidence review of implicit jury findings based on instructions that were not before the jury, we overrule the remainder of Lopez's

14

first issue. *See Hernandez v. State*, 10 S.W.3d 812, 822 (Tex. App.—Beaumont 2000, pet. ref'd) (citing *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998)).

## IV. TRIAL COURT'S EXCLUSION OF RELEVANT TESTIMONY

In her second point, Lopez argues that the trial court abused its discretion by not allowing relevant testimony from Mishler regarding Bullock's violent history. The State responds, in part, that Lopez was not harmed by the exclusion of this testimony. We will assume error and address harm.

### A. Standard of Review

Because any error in excluding the alleged evidence here is not constitutional, we apply rule 44.2(b) and disregard any error if it did not affect Lopez's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). A substantial right is affected when an error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

15

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the alleged error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

## B. Any Error Was Harmless

Lopez argues that the excluded testimony about Bullock's violent past was relevant to support her self-defense and defense-of-third-person justifications for her assault against Bullock. The following exchange occurred when defense counsel questioned Mishler about the physical struggle between him and Bullock:

Q. Were you hitting [Bullock] back?

A. No, I was not. I was just trying to keep him from getting up. My thought at the time was, [d]on't let him get to my wife, because I just knew what he did to me. And I . . . feared for her more so than myself because I didn't want him to get to her.

Q. What was the reason that you thought he might try? Why would you think he might try to assault [Lopez]?

A. I've seen him do it before. I've seen him do it to other people.

[The State]: Objection, relevance, at this point.

[The Trial Court]: Sustained.

16

Assuming, arguendo, that the trial court abused its discretion by sustaining the State's objection, other testimony in the record showed Bullock's past violent behavior. Lopez testified that just before Mishler tripped Bullock and brought him to the ground, Lopez saw a mean and agitated look on Bullock's face. Lopez explained that this look reminded her of a time when she saw Bullock throw another man from the bar into the lobby. Mishler also testified that he was afraid to let Bullock get up from the ground because of "the sheer size of the man"[7] and because he "had seen what [Bullock's] done in the past to people." Additionally, to the extent that Lopez's argument on appeal is that she should have been allowed to present additional evidence of Bullock's violent past, Lopez did not preserve error to make that showing. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked"); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009).

We conclude that, in the context of the entire case against Lopez, the trial court's purported error in sustaining the State's relevancy objection did not have a substantial or injurious effect on the jury's verdict and did not affect Lopez's

---

[7]The jury heard testimony that Bullock was approximately six inches taller and more than one hundred pounds heavier than Mishler.

substantial rights.  *See King*, 953 S.W.2d at 271.  Thus, we disregard any error.

*See* Tex. R. App. P. 44.2(b).  We overrule Lopez's second point.

## V.  CONCLUSION

Having overruled Lopez's two points, we affirm the trial court's judgments.

PER CURIAM

PANEL:  WALKER, DAUPHINOT, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 11, 2013